## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

TROY TERRELL HENRY,        )
                                  )

    Petitioner,              )
                                  )

v.                              )        Civil Action No. 3:17CV03–HEH
                                  )

VIRGINIA DEP'T OF CORRECTIONS, )
                                  )

    Respondent.          )

F I L E D

DEC - 9 2019

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

### MEMORANDUM OPINION
#### (Granting Motion to Amend and Dismissing Remaining Claims)

Troy Terrell Henry, a federal inmate proceeding *pro se*, brings this petition

pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1). In his § 2254 Petition,

Henry challenges his convictions in the Circuit Court for the City of Alexandria, Virginia

("Circuit Court") of racketeering, enticing a prostitute, and receiving money or earnings

of a prostitute. (*See* ECF No. 15–2, at 3.) By Memorandum Opinion and Order entered

on February 23, 2018, the Court granted Respondent's Motion to Dismiss in part,

dismissed Henry's six original claims, and directed Henry to file a motion to amend his

§ 2254 Petition to include any facts supporting Claims Seven through Nine. (ECF

Nos. 28, 29.) Thereafter, on March 19, 2018, Henry filed an "Amended Motion Pursuant

to 28 U.S.C. [§] 2254" ("Motion to Amend," ECF No. 31). In his Motion to Amend,

Henry seeks leave of Court to add the following claims for relief:[1]

---

[1] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the spelling, punctuation, and capitalization in the quotations from Henry's submissions.

| Claim Seven: | "Trial counsel provided ineffective assistance by allowing the Commonwealth's Attorney to vouch for a cooperating witness in the closing argument thereby infringing upon a fair trial under the Sixth Amendment." (Mot. Amend 9.) |
|---|---|
| Claim Eight: | "Counselor Mize provided ineffective assistance of counsel by failing to object to the Court's erroneous jury instruction on the conduct element of the RICO offense." (*Id.* at 14.) |
| Claim Nine: | (a) "[The] Commonwealth violated [Henry's] Fifth [and] Fourteenth Amendment due process right[s] by violating the trial court['s] sequester order;" (*id.* at 20) and, (b) "Counselor Mize provided ineffective assistance by dropping the ball on being more alert of this violation [of the Circuit Court's ruling regarding the sequestration of the witnesses]." (*Id.* at 22–23.) |

Respondent filed a Response in Opposition ("Response"), arguing, *inter alia*, that

Henry's additional claims are procedurally defaulted and barred from review here and, in

the alternative, that they lack merit. (ECF No. 38.) For the reasons set forth below,

Henry's Motion to Amend will be granted. Claims Seven, Eight, and Nine (a) and (b)

will be dismissed.

## I. PROCEDURAL HISTORY

Following a jury trial in the Circuit Court, Henry was convicted of racketeering,

enticing a prostitute, and receiving money or earnings of a prostitute. (ECF No. 15–1,

at 1–2.) The Circuit Court sentenced Henry to a total of 27 years of imprisonment, with

an additional three years suspended. (ECF No. 15–2, at 1–4.) Henry appealed.

On November 14, 2014, the Court of Appeals of Virginia denied Henry's petition

for appeal. (ECF No. 15–3, at 1.) A three-judge panel of the Court of Appeals of

Virginia also denied Henry's petition for appeal. (ECF No. 15–4, at 1.) The Supreme

Court of Virginia refused Henry's petition for appeal on January 19, 2016. (ECF No. 15–5, at 1.)

On January 4, 2017, the Court received Henry's § 2254 Petition, which included six claims for relief. (§ 2254 Pet. 5–13.) Thereafter, on June 14, 2017, Henry submitted a petition for writ of habeas corpus to the Circuit Court raising three additional habeas claims that were not presented in his original § 2254 Petition. (*See* ECF No. 17, at 3.)

On June 23, 2017, Respondent filed a Motion to Dismiss, seeking to dismiss Claims One through Six in Henry's § 2254 Petition. (ECF No. 13.) Respondent provided Henry with *Roseboro*[2] notice (ECF No. 16); however, Henry did not respond to the Motion to Dismiss, and instead, he filed a Motion for Stay and Abeyance. (ECF No. 17.) In Henry's Motion for Stay and Abeyance, Henry requested leave to supplement his § 2254 Petition by adding three additional habeas claims that were not presented in his original § 2254 Petition, and he requested that this Court hold in abeyance his § 2254 Petition pending the resolution of his state habeas proceeding. (*Id.* at 2–4.) On September 1, 2017, the Circuit Court denied Henry's state habeas petition as untimely. (ECF No. 23–1, at 1.)

By Memorandum Opinion and Order entered on February 23, 2018, the Court granted Respondent's Motion to Dismiss in part, dismissed the six claims set forth in Henry's § 2254 Petition, and directed Henry to file a motion to amend his § 2254 Petition to include any facts supporting his habeas Claims Seven through Nine. (ECF Nos. 28,

---

[2] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

29.) On March 7, 2018, Henry filed a Motion for an Extension of Time, in which he requested an extension of time to comply with the Court's February 23, 2018 Memorandum Opinion and Order. (ECF No. 30.) Thereafter, Henry filed the instant Motion to Amend, in which Henry seeks leave of Court to add three additional claims for relief. (Mot. Amend 1–25.) By Memorandum Order entered on April 3, 2018, the Court granted Henry's Motion for an Extension of Time and deemed Henry's Motion to Amend as timely filed. (ECF No. 33, at 1.)

## II. MOTION TO AMEND

As noted above, by Memorandum Opinion and Order entered on February 23, 2018, the Court, *inter alia*, directed Henry to file a motion to amend his § 2254 Petition to include any facts supporting his habeas Claims Seven through Nine. (ECF Nos. 28, 29.) In response, Henry filed a Motion to Amend and provided additional facts to support these claims. (Mot. Amend 1–25.) Upon consideration of Henry's motion, the Court will grant Henry's request to amend his original § 2254 Petition to add Claims Seven, Eight, and Nine (a) and (b), and will address the merits of these claims.

## III. EXHAUSTION AND PROCEDURAL DEFAULT

The parties argue over whether Claims Seven, Eight, and Nine (a) and (b) are procedurally defaulted. Nevertheless, because Henry's claims clearly lack merit, and because he had no counsel at his "initial-review collateral proceeding," *Martinez v. Ryan*, 566 U.S. 1, 16 (2012), and he asserts that a mailing error prevented him from appealing the Circuit Court's denial of his state habeas petition to the Supreme Court of Virginia, the Court turns to the merits of Henry's claims.

4

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Applicable Law

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

### B. Claim Seven

In Claim Seven, Henry contends that "[t]rial counsel provided ineffective assistance by allowing the Commonwealth's Attorney to vouch for a cooperating witness in the closing argument thereby infringing upon a fair trial under the Sixth Amendment." (Mot. Amend 9.) Specifically, Henry argues that the Commonwealth's Attorney "vouch[ed] for cooperating witness, Amber Miller . . . , during [the] closing argument to

the jury" (*id.*), and "Counselor Mize provided ineffective assistance of counsel by failing to object to this vouching of Ms. Miller." (*Id.* at 12.)

"A prosecutor may neither vouch for nor bolster the testimony of a government witness in arguments to the jury." *United States v. Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006) (Widener, J., concurring in part and dissenting in part) (citing *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997)). "Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." *Sanchez*, 118 F.3d at 198 (citing *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993)). In determining whether a prosecutor's comments constitute vouching or bolstering, the United States Court of Appeals for the Fourth Circuit has held that "[courts] must first decide whether the comments made in fact constituted vouching or bolstering," and then,

> [i]f so, [courts] must next determine whether the comments prejudicially affected the defendant by considering (1) the degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comments; and (4) whether the comments were deliberately made to divert the jury's attention.

*Id.* (citations omitted).

Henry identifies three specific instances in which he believes the statements of the Commonwealth's Attorney, Mr. Porter, during closing arguments, constituted improper vouching for one of the witnesses. (*See* Mot. Amend 10–11.) Specifically, Henry contends:

It all started, in the closing argument, when Mr. Porter stated that, "you've heard testimony that Ms. Miller thought that she was in love with the Defendant, that she told him she was in love with him. You've heard testimony that they were engaged to be married. She clearly was upset, when she heard that he was having sex with other prostitutes inside of the household, <u>all of that is true</u>."

(*Id.* at 10 (emphasis in original) (quoting Nov. 26, 2013 Tr. 159).) Henry also contends

that "Mr. Porter continued in closing, and stated that, 'Now, ladies and gentlemen, what I

would ask you to do is not just accept the testimony of Amber Miller, although <u>I think it's</u>

<u>incredible and inherently believable.</u>'" (*Id.* (emphasis in original) (quoting Nov. 26, 2013

Tr. 168).) Further, Henry argues:

Mr. Porter tried to finish his vouching for Ms. Miller by stating that, "the testimony of Amber Miller, yes, you know, she's still prostituting herself. Quite frankly, <u>I would prefer</u> that she weren't, but she is, but her testimony, her testimony, what you heard from her up here on the stand, was <u>completely believable</u>."

(*Id.* at 10–11 (emphasis in original) (quoting Nov. 26, 2013 Tr. 177).) Henry does not

identify any additional specific instances in which he believes that the Commonwealth's

Attorney improperly vouched for a witness, but argues generally that "Mr. Porter did

vouch for Ms. Miller by stating several times, during closing argument, that her

testimony was true, incredible and inherently believable, and completely believable."

(*Id.* at 11.)

A prosecutor's "statements or conduct must be viewed in context; only by so

doing can it be determined whether the prosecutor's conduct affected the fairness of the

trial." *United States v. Young*, 470 U.S. 1, 11 (1985). Therefore, the Court reviews the

statements identified by Henry in the context of the other arguments presented by the

7

Commonwealth's Attorney during closing arguments and in the context of the entire case. Specifically, during closing argument, the Commonwealth's Attorney argued:

All the Commonwealth wants today is to hold the Defendant accountable for inflicting woe and misery on any number of people, primarily young women, working for him as prostitutes during the time frame classified here.

He should be held accountable for what he did, just like any human being should be held accountable, and on the evidence you heard, the only verdict that would hold him accountable for [his] action is guilty on all three counts.

Now, I would submit to you, ladies and gentlemen, that the Defendant is the primary moving force behind the enterprise that you've heard about.

I would ask you when you go into the jury room and the 12 of you[] are talking about this case, I'd ask you to think about the testimony that you've heard from primarily, the two prostitutes that testified, and one of the first things I would ask you to consider is the fact that Amber Miller was 19 when she met the Defendant, and that Cynthia Orr was in her early 20's, 21 or 22, when she met the Defendant, and the Defendant was 35 or 36.

With Amber Miller, that's almost twice her age, and I would submit to you that her emotional age was less than 19, and I would submit to you that what the Defendant did was pimp marginal -- I'm sorry, a person on the margins of society, who was vulnerable and decided that that was the type of person that he could recruit for his business.

Now, the psychology of prostitution and pimp, that relationship is a difficult one.

You've heard testimony that Ms. Miller thought that she was in love with the Defendant, that she told him she was in love with him. You've heard testimony that they were engaged to be married. She clearly was upset, when she heard that he was having sex with other prostitutes inside of the household, all of that is true.

I think it's even possible that on some level, the Defendant himself did have feelings for Ms. Miller at some point.

I don't think he actually intended on marrying her. I don't think Troy Henry is the marrying type, but I would believe that he might have had some feelings for her, at some point in the relationship.

But he used those feelings. She testified that she had a crush on him at the very beginning. He used those feelings to get her into this life style.

Now, yes, the Defense will make a big deal about the fact that she had another pimp in Sugaroo for about two days, three days, before she met the Defendant. But Ms. Miller's testimony was that the Defendant taught her the rules of the game.

I would submit to you, finding a vulnerable young women from the margins of society, taking advantage of her crush, making these -- making her think that you're her boyfriend, that you love her and that you want to marry her is a very powerful way of manipulating her to do what you want.

I ask you to consider that, when you go into the jury room, and I would point out to each and every one of you, could the Defendant really love her, if he allowed her to prostitute herself?

The testimony really, boils down to the fact that the Defendant told her he would marry her, supposedly engaged, allow[ed] her to sell her body for $150 for a half-hour, to literally hundreds of anonymous men. That, ladies and gentlemen, is not love.

That is manipulation, and I would submit to you that the Defendant is a master manipulator.

That is how he got these vulnerable young women on the margins of society, and I would submit to you that he is the driving force behind this.

I would also point out to you that the Commonwealth in this case, is concerned about the activities going on here in Alexandria, and I don't think that on this evidence, there is any way that Ms. Miller and Ms. Orr would have ended in our city, in the City of Alexandria, committing these offenses, without the Defendant putting them into his Excursion, and driving them down I95 to this area.

The Defendant is a manipulator and driving force in this case, and I would ask you to discuss that, when you go back to the jury room.

(Nov. 26, 2013 Tr. 157–62 (emphasis added).) The Commonwealth's Attorney further

argued:

Then we move to causing, encouraging, persuading a prostitute to engage in prostitution. You'll have this instruction again. The instruction says, "Troy Henry, the Defendant is charged with a crime of causing Amber Miller to enter a [bawdy] place."

The Commonwealth must prove beyond a reasonable doubt, each of the following elements of that crime, that Troy Henry, the Defendant, knowingly took Amber Miller into or persuaded, encouraged or caused her to enter a [bawdy] place, and that he did so for the purpose of having her prostitute herself.

Now, ladies and gentlemen, what I would ask you to do is not just accept the testimony of Amber Miller, although I think it's incredible and inherently believable, corroborate[d] by Cynthia Orr, but look at the text messages.

Yes, you have text back and forth about how she's in love with him, until she gets tired of him at the very end, tired of the way he's treating her.

But you also have text messages in which she's telling him the amounts of money that she has received. She tells him that she's got an in-call coming in, and the dates on those text messages corroborate her statement that she was here in July, in Alexandria for the purposes of committing prostitution, and that she was here in Alexandria in August, at the Crown Plaza, for purposes of committing prostitution.

(Nov. 26, 2013 Tr. 168–69 (emphasis added).) Additionally, in the course of the

Commonwealth Attorney's closing argument, he argued:

The testimony of Amber Miller, yes, you know, she's still prostituting herself. Quite frankly, I would prefer that she weren't, but she is, but her testimony, her testimony, what you heard from her up here on the stand, was completely believable.

Yes, they had a romantic relationship. Yes, it didn't work out. Yes, she was upset by the fact that he was having sex with somebody else.

But did they really establish a motive for her to come in here and just make everything up? Everything. Did the Defense establish a motive for Cynthia Orr to get on the stand and just make everything up?

I would ask you when you're thinking about the credibility of these witnesses, ladies and gentlemen, don't lose sight of the fact that you're going to have to think about this, [would] two women, who do not know anyone in this Courtroom really, walk in here, stand up here, get up here on this stand and testify about the horrible things they've done to a room full of strangers.

I don't think Amber Miller belittled her own opportunities or her own involvement. She told it like it was. It wasn't pretty. But she told it like it was.

Cynthia Orr came in. What did she admit to? Not only prostituting herself, with anonymous strangers off the internet for small amounts of money, that in [the] aggregate, added up to a lot of money. She also talked about her drugs. Do you think that is easy? Do you think it's easy for a witness to come in off the street and walk up in front of a room full of strangers and admit that she had sexual intercourse and had to say the words penis and vagina in front of a group full of strangers?

What possible motive does Cynthia Orr have to come in here and paint him out as a pimp? The answer is, none.

But even if you don't believe them on their face, the other evidence that was submitted in this case corroborates the Commonwealth's position.

Read those text messages, when you go back into the jury room. If you, as a jury, go back in that jury room and read those text messages and don't think that he was a pimp, go ahead and acquit him.

(Nov. 26, 2013 Tr. 177–79 (emphasis added).)

As set forth above, during closing arguments, the Commonwealth's Attorney presented arguments regarding the witnesses' motivations, which were consistent with the facts presented at trial. In the context of the Commonwealth's Attorney's closing arguments and the entire case, the statements, as a whole, did not suggest to the jury that the prosecutor could vouch for the credibility of the witnesses based on personal knowledge or other information not presented to the jury. Instead, the Commonwealth's Attorney argued to the jury that, based on a totality of the evidence, it had reason to believe certain witnesses. Prosecutors are permitted to make arguments to the jury regarding the prosecution's version of the testimony, the reasonable inferences drawn from the testimony, and the weight he or she believes should be given to certain testimony. *See United States v. Hayes*, 118 F. App'x 856, 858 (5th Cir. 2004) (holding that the "comments challenged by [the defendant] were permissible requests that the jury draw reasonable inferences from the evidence and a permissible argument that, under the evidence presented, the officers had no reason to lie" (citation omitted)); *cf. Lungberg v. Scribner*, 584 F. App'x 809, 811 (9th Cir. 2014) (discussing that "it is neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand" (quoting *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010))).

Moreover, in the context of a Sixth Amendment ineffective assistance claim, "the question [the Court must] ask is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir.

11

1994) ("Counsel's decision to object during the prosecutor's summation must take into account the possibility that the court will overrule it and that the objection will either antagonize the jury or underscore the prosecutor's words in their minds."); *see Young*, 470 U.S. at 13 ("[I]nterruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously.") Here, counsel reasonably eschewed objecting to the three comments identified by Henry.

Even if the prosecutor's comments were improper, they were brief and isolated, and were not so egregious in the context of the Commonwealth's Attorney's entire closing argument and the testimony and evidence presented during the case. To the contrary, noting an objection would have drawn the jury's attention to the comments. *See Bussard*, 32 F.3d at 324 (discussing that "a lawyer might well choose to leave [a statement by the prosecutor] under wraps, rather than making an objection that would invite the jury to ponder the ambiguous statement"); *see also Moore v. United States*, 934 F. Supp. 724, 726–28 (E.D. Va. 1996) (holding that counsel's failure "to object to the prosecutor's statement in closing argument that [the defendant] and his brother had 'lied' on the witness stand" was "a reasonable trial tactic" and explaining that "all experienced practitioners recognize that not infrequently, it is better to remain silent than to draw attention to a matter by offering an objection").

Furthermore, Henry fails to demonstrate any prejudice from counsel's failure to object to the three comments. Henry simply fails to demonstrate that there is a reasonable probability that an objection by counsel would have altered the outcome of his trial. Overwhelming evidence existed of Henry's guilt. All of the evidence established

that various women, including Ms. Miller and Ms. Orr, both of whom were witnesses at Henry's trial, worked for Henry as prostitutes in various locations on the East coast, including in Alexandria, Virginia, and that while working as prostitutes, the women would give all of the money they earned from prostitution to Henry. (*See, e.g.*, Nov. 25, 2013 Tr. 218, 402.) For example, Ms. Orr testified that she worked as a "part of [Henry's] household," meaning that she would "[b]ring in money [by] prostituting" and would give the money she earned by prostituting to Henry. (Nov. 25, 2013 Tr. 402–03.) With respect to the other women who worked for Henry, Ms. Miller testified that Henry recruited other women to work for him as prostitutes, including "Cream," "Kim," "Diamond," "Janelle," and "Dee." (Nov. 25, 2013 Tr. 200–01, 217–18.) In light of the overwhelming evidence of Henry's guilt, Henry fails to demonstrate that any objection to the prosecutor's remarks would have altered the outcome of the trial. Accordingly, because Henry fails to demonstrate any deficiency of counsel or resulting prejudice, Claim Seven will be dismissed.

## C. Claim Eight

In Claim Eight, Henry contends that "Counselor Mize provided ineffective assistance of counsel by failing to object to the Court's erroneous jury instruction on the conduct element of the RICO offense." (Mot. Amend 14.) Specifically, Henry argues that the Circuit Court "gave an erroneous view of [the] law that failed to properly define what type of 'conduct or participation' was needed in order to violate the RICO offense." (*Id.* at 16.) Henry identifies the following jury instruction as an erroneous instruction that "completely went against Supreme Court precedent:"

Troy Henry is charged with the crime of racketeering. The Commonwealth must prove [beyond] a reasonable doubt each of the following elements of that crime.

'One, that Troy Henry was associated with a[n] enterprise and two, that Troy Henry conducted or participated directly or indirectly in such enterprise through racketeering activity.'

(*Id.* at 16–17 (citation omitted).) Henry argues that "[t]he Supreme Court has held that the 'conduct or participate' element requires a defendant to 'have some part in directing those affairs.'" (*Id.* at 17 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (2003)).) Further, Henry argues that "[i]n addition to failing to properly instruct the jury on the 'conduct or participation' element, the trial court also failed to instruct on the 'requisite nexus' between the defendant's [conduct] and the conduct of the affairs of an enterprise." (*Id.*) Henry contends:

[T]here must be not only a "nexus between the [defendant] and the conduct [of] the affairs of an enterprise," but also a nexus between the conduct of those affairs and the pattern of racketeering activity. The plain language of the statute requires that the "pattern of racketeering activity" be a means by which the defendant "participate[s], directly or indirectly, in the conduct of [the] enterprise's affairs."

(*Id.* at 18 (second, third, fourth, and fifth alterations in original) (citations omitted).)

As an initial matter, Henry incorrectly asserts that he was convicted of a "RICO offense." (Mot. Amend 14.) The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, which is known as RICO, is a federal statute. *See, e.g., United States v. Mathis*, 932 F.3d 242, 249 (4th Cir. 2019); *see also* 18 U.S.C. § 1962. As relevant to Henry's instant § 2254 Petition, Henry was convicted of racketeering in violation of Va. Code Ann. § 18.2–514(C). (*See* ECF No. 15–2, at 1, 3.) Section 18.2–514(C) of the Virginia Code provides: "It shall be unlawful for any person employed by, or associated

with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through racketeering activity." Va. Code Ann. § 18.2–514(C) (West 2019).

The Circuit Court's jury instructions mirrored the language of Va. Code Ann. § 18.2–514(C), the Virginia statute under which Henry was charged with racketeering. Specifically, the Circuit Court provided the following instruction to the jury with respect to the racketeering charge:

> Troy Henry is charged with the crime of racketeering. The Commonwealth must prove beyond a reasonable doubt, each of the following elements of that crime.
> One, that Troy Henry was associated with an enterprise and two, that Troy Henry conducted or participated directly or indirectly in such enterprise through racketeering activity.
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt, each of the above elements of the crime as charged, then you shall find Troy Henry guilty of racketeering, but you shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt, any one or more of the elements of the crime, then you should -- then you shall find Troy Henry not guilty.
> The term racketeering activity means to commit, attempt to commit, conspire to commit or solicit, coerce or intimidate another to commit two or more of the following offenses.
> One, aiding prostitution or elicit sexual intercourse, two, for purposes of prostitution or unlawful sexual intercourse, takes any person into or persuades, encourages or causes any person to enter a [bawdy] place, three, receiving money from prostitution.
> Enterprise is defined as a group of three or more individuals associated for the purpose of criminal activity.

(Nov. 26, 2013 Tr. 152–53.)

Henry argues that the Circuit Court should have incorporated language from the federal racketeering statute when instructing the jury regarding the Virginia racketeering charge, and that counsel provided ineffective assistance when counsel failed to object to

the Circuit Court's jury instruction regarding this charge. (*See, e.g.*, Mot. Amend 15–18.) Henry contends that "the most analogous to the Commonwealth's RICO offense that Mr. Henry was convicted of is 18 U.S.C. § 1962(c)." (*Id.* at 16.) Pursuant to 18 U.S.C. § 1962(c):

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Although Virginia's racketeering statute is similar to the federal racketeering statute, the language of the two statutes is not identical. When, as is the case here, "[a federal statute] is not identical to the Virginia enactment," the Supreme Court of Virginia has held that "[d]ecisions rendered in other jurisdictions upon statutes more or less similar, but not identical in terms with [Virginia's], cannot control the plain and unambiguous terms of [Virginia's] statute law." *Turner v. Commonwealth*, 309 S.E.2d 337, 462 (Va. 1983) (citation omitted). Thus, because Virginia's racketeering statute and the federal racketeering statute are not identical, counsel reasonably eschewed raising the challenge that Henry urges here regarding the jury instruction for the racketeering charge.

Moreover, Henry fails to demonstrate any prejudice from counsel's failure to object to the racketeering jury instruction. Henry argues that had counsel objected to the RICO jury instruction,

> Mr. Henry would not have been found guilty under the RICO offense because he was never alleged to have held any management or operation part of this alleged RICO offense, and the "nexus" requirement with Mr. Henry and this enterprise lacked the necessary evidence to tie and prove that he ran or was part of this alleged RICO enterprise.

(Mot. Amend 19.) However, contrary to Henry's assertion that he was not alleged to "have held any management" position and that "the enterprise lacked the necessary evidence to tie and prove that he ran or was part of this alleged RICO enterprise" (*id.*), the evidence at trial established that a hierarchical structure existed in which Henry was the pimp and multiple women worked for him as prostitutes. *See United States v. Tillett*, 763 F.2d 628, 631 (1985) ("Although the faces in the group may have changed, there was substantial evidence of a structure within the group within which the various associates operated according to their specific function with regard to the [criminal enterprise].") Specifically, the evidence presented at Henry's trial established that multiple women worked for Henry as prostitutes and that the women would give all of the money that they earned from prostitution to Henry. (*See, e.g.*, Nov. 25, 2013 Tr. 200–01, 217–18, 402–03.) In light of the overwhelming evidence of Henry's managerial-type role in the criminal enterprise, Henry fails to demonstrate any prejudice from counsel's failure to object to the racketeering jury instruction.

Thus, for the reasons set forth above, counsel reasonably eschewed raising a meritless argument with respect to the jury instructions regarding Henry's role in the criminal enterprise. Henry fails to demonstrate that counsel's inaction regarding this meritless argument resulted in any deficiency or resulting prejudice. *See Strickland*, 466 U.S. at 694, 697. Accordingly, Claim Eight lacks merit, and will be dismissed.

### D.     Claim Nine (b)

In Claim Nine (b), Henry contends that "Counselor Mize provided ineffective assistance by dropping the ball on being more alert of [the] violation [of the Circuit Court's ruling regarding the sequestration of the witnesses]." (Mot. Amend 22–23.)

With respect to the sequestration of the witnesses at Henry's trial, at a pretrial hearing, the Circuit Court addressed Henry's counsel's request that "the [Circuit] Court . . . rule on a sequester of witnesses." (Nov. 7, 2013 Tr. 5–6.) The Commonwealth advised that the witnesses would be housed in single occupancy rooms, and Henry's counsel indicated that "resolve[d] the issue that was raised in the Defense motion." (Nov. 7, 2013 Tr. 6.) Additionally, on the first day of Henry's trial, Henry's counsel requested that "the witnesses be excused from the courtroom." (Nov. 25, 2013 Tr. 31.) After the witnesses were introduced "to ascertain whether any of the [jury] panelists [knew] the witnesses," the Circuit Court requested that the witnesses "retire to the hallway" to wait to be called to testify. (Nov. 25, 2013 Tr. 31, 38.)

In Claim Nine (b), Henry asserts that, during his trial, the witnesses discussed their trial testimony in violation of the Circuit Court's ruling regarding the sequestration of witnesses. Henry contends that he learned of Claim Nine (b) as a result of "newly discovered evidence" in the form of "a September 25, 2016 email by cooperating witness, Heather Fox-Cardenas" and his own declaration. (*Id.* at 20.) Specifically, Henry contends that:

> Ms. Fox stated through an email correspondence with Mr. Henry, through
> the federal prison's Corrlinc computer system, that Ms. Miller and Ms. Orr
> along with other alleged prostitutes who were all waiting together outside the

18

courtroom, talked about the case and their trial testimony. In addition to talking about the case, they also were sharing stories about their continued activities of prostituting around America.

(*Id.* at 22.)

As an initial matter, Ms. Fox's emails with Henry are not sworn to under penalty of perjury, and as such, the emails do not constitute sworn evidence. *See Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (refusing to consider documents verified in such a manner to avoid the penalty of perjury); *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *2–3 & n.5 (E.D. Va. June 1, 2011) (treating statements sworn to under penalty of perjury, but made upon information and belief, as "mere pleading allegations") (quoting *Walker v. Tyler Cty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001)). Additionally, based on the sum of the discussions in the emails, Ms. Fox's motives for assisting Henry are unclear. For example, in one of the emails to Ms. Fox, in the course of asking Ms. Fox for information regarding his case, Henry stated: "I will have my mother help you out, but I need your help as well." (ECF No. 31–2, at 3.)

Furthermore, even setting aside these issues with Ms. Fox's emails, the emails do not establish that the potential witnesses discussed their trial testimony with each other, much less changed their testimony in light of that discussion. For example, in one email, Ms. Fox stated that "in the waiting room," unidentified potential witnesses were "[s]aying [Henry] had herpes etc." (*Id.* at 4.) In response, Henry stated, among other things: "I just need to know what happened between you all prior to trial and how many times did you all meet up and chat about the case?" (*Id.*) Ms. Fox stated:

Okay, again I didn't meet up with no one Troy. So you can tell the FBI [to] stop lying [because] they didn't fly me [out] at all. I can promise that. I was already living there in Virginia. I will contact Sunshine [and] ask her what she knows [because] when I was there I only met everyone because I went in the waiting room. All they talked about to me was when Amber said you came to Charlotte planning to beat my ass. But she said you also used to talk about how I used to go get it. But her and Cynthia said you used to say you [were] going [to] get even [because] you [were] going [to] set me up. Cynthia told everyone how you choked her out in the tub. Amber said you never hit her but she used to help you trap girls in the room [and] watch you beat them. Sunshine said something about you burned her with [an] iron back in Kissimmee. But all me and Sunshine said to Amber [and] Cynthia was that's not the Troy we remember [because] if he ain't really hit [you all] then that is not the same man. They asked about Jojo [and] if I [knew] you tried to kill her and leave her for [dead]. I didn't even [know] the black girl was Amber's girlfriend [until] they said something. I was sitting there listening. More than anything. I know Sunshine was mad [because] she wanted to testify.

(*Id.*) Contrary to Henry's assertions, Ms. Fox's emails do not establish that the potential witnesses discussed their trial testimony. Henry was charged with and convicted of racketeering, enticing a prostitute, and receiving money or earnings of a prostitute. As set forth in Ms. Fox's emails, the topics discussed by the potential witnesses did not include Henry's charges or their trial testimony.

Henry also submits his own declaration, in which he states, in sum:

I, Troy Terrell Henry, being competent to make this declaration and having personal knowledge of matters stated herein, declares pursuant to perjury laws of Virginia:

1) I, Troy T. Henry, am the person who viewed the Commonwealth's witness, Amber Miller, Sherry Leclair, Cynthia Orr, Heather Fox-Cardenas, Jackie (lnu) and others sitting behind me chatting amongst each other on November 25th, 2013, which was the day of my trial.

2) I, Troy T. Henry, am the person who made visual eye-contact with Sherry Leclair on the morning of my trial, which was on November 25th, 2013. Ms. Leclair was looking at me with hostile/angry faces while sitting and chatting with Amber Miller, Cynthia Orr, Heather Fox-Cardenas, Jackie (lnu) and others on November 25th, 2013, which was the day of my trial.

3) I, Troy T. Henry, am the person who made visual eye-contact with Jackie (lnu), Amber Miller's lover, whom was directing obscene and threatening gestures to me on November 25th, 2013, which was the day of my trial. This occurred in the courtroom, while she was sitting and speaking with Amber Miller, Sherry Leclair, Heather Fox-Cardenas and others.

4) I, Troy T. Henry, am the person who informed Paul Peppers and Jasmin Mize of the obscene and threatening gestures I was receiving from Ms. Miller's lover on the day of trial. Ms. Mize and Mr. Peppers asked the Court to approach the bench. The Court granted the request and the lawyers from the defense as well as the prosecution, approached the bench to confer. I don't know what the side-bar conference was about, but the judge dismissed all of the Commonwealth's witnesses and they all left together.

(ECF No. 31–3, at 2–3.) Although Henry indicates that before his trial started, individuals who knew the potential witnesses made "threatening gestures" and looked at him with "hostile/angry faces," such actions do not demonstrate that the witnesses discussed their trial testimony before or during Henry's trial and that they violated the Circuit Court's ruling regarding the sequestration of the witnesses. Instead, in his declaration, Henry indicates that his counsel requested a bench conference after he alerted counsel to the presence of the potential witnesses in the courtroom, and at the conclusion of the bench conference, the witnesses left the courtroom pursuant to the Circuit Court's request for them to do so. Furthermore, as discussed above, Henry fails to demonstrate that the potential witnesses discussed their trial testimony during Henry's trial after they were instructed to leave the courtroom. Thus, counsel reasonably eschewed the challenge that Henry urges here.

Moreover, Henry fails to demonstrate any prejudice from counsel's failure to object to the potential witnesses waiting in the same room outside of the courtroom during Henry's trial. As discussed above, based on the overwhelming evidence of

Henry's guilt, *see supra* p. 16, Henry fails to demonstrate that there is a reasonable probability that an objection by counsel would have altered the outcome of his trial.

Thus, counsel reasonably eschewed raising a meritless argument with respect to the sequestration of the prosecution's witnesses. Henry fails to demonstrate that counsel's inaction regarding this meritless argument resulted in any deficiency or resulting prejudice. *See Strickland*, 466 U.S. at 694, 697. Accordingly, Claim Nine (b) lacks merit, and will be dismissed.

## V. DUE PROCESS

In Claim Nine (a), Henry contends that "[the] Commonwealth violated [Henry's] Fifth [and] Fourteenth Amendment due process right[s] by violating the trial court['s] sequester order." (Mot. Amend 20.) As discussed above, Henry fails to demonstrate that any violation of the Circuit Court's ruling regarding the sequestration of the witnesses. *See supra* Part III.D. Thus, Henry fails to demonstrate that the Commonwealth violated his due process rights with respect to the sequestration of the Commonwealth's witnesses. Accordingly, Claim Nine (a) lacks merit, and will be dismissed.

## VI. CONCLUSION

For the foregoing reasons, Henry's Motion to Amend (ECF No. 31) will be granted. Claims Seven, Eight, and Nine (a) and (b) will be dismissed. The action will be dismissed. A certificate of appealability will be denied.[3]

An appropriate Order shall issue.

It is so ORDERED.

/s/
_____
HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: Dec. 9, 2019
Richmond, Virginia

---

[3] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Henry fails to meet this standard.